Daniel Hampton
1171 Lodge Circle
Spring Hill, FL 34606

JUN 4 2026 PM2:16
FILED - USDC - FLMD - TPA

**UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA**

8:26-CV-1659-TPB-TGW

------------------------------------------------

DANIEL HAMPTON,

*Plaintiff,*

-against-

UNITED STATES OF AMERICA, MEGAN
FREISMUTH, JOAN MAGGIORE

*Defendant.*
*Defendants.*

------------------------------------------------

**COMPLAINT**

1. Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA").

2. FOURTEENTH AMENDMENT (Fair Proceedings)

3. Emotional Pain and Suffering

4. Common Law Fraud in Fact

**JURY TRIAL DEMANDED**

TPA 74398
8405

Plaintiff DANIEL HAMPTON, alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action seeking monetary and equitable relief based upon Defendants' violations of Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA").

2.      The conduct complained of in this action involves Defendants' negligence and interference with the outcome of *Hampton v. Veterans*. The underlying action involves the submission by government attorney Megan Freismuth, with then plaintiff's attorneys, Thomas Ricotta and Matthew Marks of a stipulation not entered into with the permission of Mr. Hampton. Attorneys, Thomas Ricotta, and Matthew Marks settled with Mr. Hampton, for their role in the underlying dispute.

3.      In the stipulation - attorneys, initiated by the government agreed to a stipulation that Plaintiff never agreed to.

4.      Ultimately in the trial, Hampton was limited to the stipulation.

5.      Defendant, United States, through assistant United States attorney Megan Freismuth, has not contributed to making the Plaintiff whole regarding the underlying negligence.

6.      Plaintiff has notified assistant U.S attorney Freismuth of the infraction, through various channels, including appeals. *See, writ of certiorari*. She has alleged she is immune to this action for her origination, drafting and omissions in the stipulation. However, plaintiff disagrees that defendant Freismuth is immune to the specific allowance guaranteed under FTCA law, and that she is an equal tortfeasor, if not more culpable than Hampton's previous attorneys.

7.      The Department of Justice (DOJ) has long recognized that personal liability tort claims against federal employees implicate the interests of the United States. Accordingly, 28 U.S.C. § 517 authorizes DOJ attorneys to defend these claims in accordance with guidelines

found at 28 C.F.R. §§ 50.15 and 50.16. *See also* USAM § 4-5.412.

8.   Individual capacity representation is available for current or former federal employees who have been "sued, subpoenaed, or charged in their individual capacities." 28 C.F.R. § 50.15 (2010). Here, Ms. Freismuth is still employed by assistant U.S attorney and is charged in her individual capacity.

9.   By law (1) whether the employee is named in the caption as required by Fed. R. CIV. P. 10(a); (2) whether there is an allegation that the employee acted wrongfully; and (3) whether the prayer for relief seeks monetary damages. If all three of these things are present in the complaint, the employee can and should request individual capacity representation.

10. Plaintiff attaches as Exhibit: 1, writ of certiorari submitted to the U.S. Supreme Court on the matter.

## EXHAUSTION OF ADMININISTRATIVE REMEDIES

1. On January 13th, 2025, the U.S. Supreme Court denied Mr. Hampton's appeal of the underlying claim of negligence against the United States.

2. On January 27th, 2025, the U.S. Department of Justice received Mr. Hampton's FTCA form.

3. By January 27th, 2026, Hampton had not heard from the U.S. Department of Justice.

4. *This action is timely, within two years of injury and cause of action.*

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this civil rights action pursuant to 28 U.S.C. §§ 1331, 1338 (a) and 1338 (b), and under its supplemental jurisdiction.

22. This Court has personal jurisdiction over Defendants because Plaintiff resides in this Federal District.

23. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because Plaintiff resides in this federal District.

## PARTIES

24. Plaintiff is currently a 43-year-old African American male who worked as a Medical Supply Technician at the Northport VA Medical Center, form December 2009 till April 16, 2016.

25. Defendant Megan Freismuth is an assistant US attorney who represented the United States in the underlying case *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021); herein "trial

26. Defendant Joan Maggorie, worked with plaintiff at the Veteran's hospital, the Northport VA veteran's affair, she testified during the retaliation employment trial and was Hampton's supervisor.

27. Wilmino Sainbert worked at Veterans Hospital at HR. He testified at trial.

28. Angel Tejida worked at veterans Hospital. Letter sent to EEO, Equal Employment Office, on his behalf.

29. Philip Mochitia worked at veterans Hospital as director of HR. He sent a letter to EEO on his behalf.

30. Steven Snyder, worked at the veterans Hospital. He testified on behalf of defendants during the underlying trial, *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021).

## STATEMENT OF FACTS

### UNDERLYING EMPLOYMENT CLAIMS:

*Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021)

31. On December 6, 2009, Plaintiff accepted a temporary appointment, not to exceed three years, as a Medical Supply Technician with the Sterile Processing Service

("SPS"), at the VA Medical Center in Northport, NY, earning $19 dollars per hour.

32. Plaintiff's job duties consisted of sterilizing and assembling surgical instruments for use in surgery.

33. The Chief of SPS, Joan Maggiore ("JM"), was Plaintiff's immediate supervisor.

34. On or about June 28, 2010, Plaintiff's co-workers learned from the social media website, Facebook that Plaintiff placed a new tattoo on his back.

35. The tattoo was not visible, so JM asked Plaintiff to remove his shirt to show his tattoo to her, which he refused to do, since the tattoo had nothing to do with work and he did not want to expose the bare skin on his back.

36. Approximately 15 minutes later, JM called Plaintiff into her office and closed the door behind him, thus, plaintiff was separated from the view of other employees.

37. JM positioned herself between the door and Plaintiff, suggesting that he was not free to leave the office.

38. JM told Plaintiff to take his shirt off and to show her his back tattoo.

39.     Plaintiff attempted to leave JM's office but she blocked his exit and insisted that he comply with her directive.

40.     In fear for his job, Plaintiff reluctantly took his shirt off to reveal his tattoo.

41.     JM looked Plaintiff up and down and stated that he did not have a "V shaped back".

42.     Plaintiff said he felt uncomfortable and the comments about his body were unwelcomed and inappropriate.

43.     Also, around this time, JM often commented to Plaintiff on how she checked on what was going on in his personal life through his postings on Facebook, which Plaintiff understood to mean that JM was romantically interested in him.

44.     During the June 28, 2010, meeting, Plaintiff told JM to stop viewing his Facebook page and blocked her from doing so.

45.     JM became visibly upset after Plaintiff told JM to stop looking at his page.

46.     After Plaintiff told JM to stop looking at his page, JM began to scrutinize

Plaintiff's work more than other Medical Supply Techs.

47.    For example, JM ordered lead technician, Elizabeth Thomas-Cutty to review his trays (a tray are all the tools needed for a particular surgery) for cleanliness, whereas other Medical Supply Technician's did to receive such scrutiny.

48.    On February 16, 2012, Plaintiff was sick so he did not report to work and he used a sick day, following proper procedure.

49.    On February 23, 2012, JM asked Plaintiff if he wanted to "fuck" her and Valencia, a Medical Support Assistant, at the same time.

50.    Plaintiff rebuffed JM's request and told her "no".

51.    On February 24, 2012, JM told Plaintiff that he need to submit a sick day slip for February 16, but told Plaintiff that if he came to her office to "earn [his] time back", she wouldn't require him to use a sick day.

52.    Plaintiff understood this to mean that if he had sex with JM, he would not have to utilize a sick day for his absence on February 16. He refused.

53.    JM physically touched Plaintiff by rubbing his arm on both February 28 and 29, 2012.

54.    Plaintiff asked JM several times to stop touching him but she did not stop.

55.    When Plaintiff refused to allow JM to touch him, she threatened to discipline Plaintiff for processing dirty scopes, an infraction he did not commit and one for which, even if he did commit, does not typically result in discipline.

56.    On or around April 2013, Plaintiff sent an anonymous letter to Rosie Chapman, Chief Nurse Executive concerning JM's harassment of Plaintiff as described above.

57.    A few weeks after Plaintiff sent the letter to Ms. Chapman, and not having heard anything about his complaint, Plaintiff told Chapman verbally he was being harassed by JM.

58.    Neither Chapman nor any other agent of Defendant took any action to investigate or correct the harassment and it continued.

59.    For example, in or around May 2013, JM and her secretary Ruth were discussing and commenting about anal sex openly in common/break area. JM stated "you got to do what you got to do to please the man".

60.    Both Plaintiff and co-worker, Carrie Washington who were having lunch together at an adjacent table got up and left the break area because of JM's comments about anal sex and pleasing "the man".

61.    In July 2013, Plaintiff was injured at work and missed approximately six weeks.

62. During his time away from work, JM often texted or called Plaintiff about non-work-related matters, including who he was with and what he was doing, at times, asking him inappropriate questions about his body such as why Plaintiff cannot have children, why Plaintiff is not married and why Plaintiff has foster children.

63. In October 2013, JM questioned Plaintiff's ability to bear children, asking him if it was him who could not have children or his girlfriend who could not have children.

64. In July 2014, JM stated that a co-worker had a nice chest and that she was attracted to him.

65. In September 2014, JM asked Plaintiff why he lived with a foster child and why his girlfriend and he cannot bear children.

66. JM's comment upset Plaintiff because the difficulties Plaintiff and his girlfriend may have are personal and sensitive to both of them and an issue he was not comfortable discussing at work, and advised JM of this.

67. On January 26, 2015, in front of Ruth Schuler, JM touched Plaintiff in the lower abdominal area and asked if he was losing weight.

68.     Shocked, Plaintiff exclaimed "what the F#*k is wrong with you?" Then JM went into her office closed the door.

69.     Plaintiff had previously requested weekly leave without pay ("LWOP") so that he can take his foster son to doctor appointments or to visits with his biological mother.

70.     The requests were submitted to JM who approved the request.

71.     On January 28, 2015, Plaintiff submitted the leave request to JM, per procedure.

72.     Although such requests are routinely approved by supervisors, JM denied Plaintiff's request for no stated reason nor was there any possible legitimate reason to deny the request.

73.     At or about this time, JM told Plaintiff that his facial hair was thick and nasty and that she likes him better when he is clean shaven.

74.     In early February 2015, Plaintiff complained to his union representative, Steve Tucci about JM's physical and verbal harassment and abuse.

75.     Plaintiff also made similar complaints to William Burton, Facility Equal Employment Opportunity Specialist but Burton did not investigate or take corrective action, even though Burton is the individual specifically charged with handling complaints of this nature.

76.     On or about April 12, 2015, Plaintiff asked JM for permission to take off April 13, 2015.

77.     JM approved the request and Plaintiff took the day off, but on April 14, 2015, JM nonetheless marked Plaintiff AWOL, which remained part of his personnel and employee record.

78.     On May 5, 2015, Plaintiff requested a few days of leave to care for his sick foster child, but JM denied Plaintiff request for leave, again without a reasonable or legitimate reason being present and with such requests being routinely granted to other employees in the unit.

79.     Plaintiff again complained to his union that JM had discriminatorily denied him leave after which, the leave was again granted, suggesting there indeed was no legitimate reason for the denial.

80.     On May 12, 2015, Plaintiff complained to Philip Moschitta, Facility Director, concerning JM's inappropriate touching, inappropriate comments, and the denial to utilize his time and leave after his previous complaint.

81.     Moschitta did not respond to Plaintiff or take action to protect him from further harassment or retaliation nor did he refer him to EEO.

82.    On May 13, 2015, JM came to Plaintiff's work area, and in front of him, scratched her inner thigh. JM stated I "was scratching my leg … I don't want you think I was scratching my crotch," thus showing her knowledge of Plaintiff's complaints about her.

83.    On June 3, 2015, JM required that Plaintiff report to her when he first comes to work so she "knows [he's] here". Prior to his complaints, Plaintiff was not required to report to JM upon getting to work.

84.    On or about June 18, 2015, JM falsely accused Plaintiff of improperly handling eyeglass lenses and said that she should terminate him. JM asked Plaintiff to sign a Report of Contact, which is a report submitted by the employee to a supervisor about something they did wrong.    Plaintiff refused because he did not improperly handle eyeglass lenses as JM alleged.

85.    On June 25, 2015, JM again threatened to terminate Plaintiff's employment despite his above satisfactory performance.

86.    On July 20, 2015, JM provided Plaintiff with improper instructions on how to

clean one of the medical devices.

87.    On or about August 18, 2015, Plaintiff filed an "informal" complaint with ORM through EEO Counselor, Nicolas Maxin. Although termed an informal complaint, this is the first statutorily required step for federal employees to begin an EEO investigation.

88.    In September 2015, JM required Plaintiff to wear a face cover, but other similarly situated employees having facial hair were not required to do so.

89.    On or about, October 29, 2015, mediation was conducted, no resolution was reached and Plaintiff was notified of his right to file a formal EEO complaint.

90.    On November 6, 2015, a "formal complaint" was filed with the VA, Office of Resolution Management.

91.    On November 16, 2015, Plaintiff was informed that he must contact JM directly when calling out sick. Prior to Plaintiff's complaints he was not required to contact JM directly.

92.    Beginning in December 2015, JM refused to process Plaintiff's time and leave requests in a timely fashion and she only responded to the requests when Plaintiff asked about them.

93.    On January 11, 2016, the Assistant Chief, Mary Catherin Sinkus, stated to Plaintiff that her ass was getting "fat and not in a good way".

94.    On January 28, 2016, JM made Plaintiff feel uncomfortable when she entered his work area and blocked his exit with her body.

95.     On February 22, 2016, Sinkus stated to Plaintiff that "You should watch your mouth Daniel…" Plaintiff understood this to mean that he should watch who he complains to and who he complains about.

96.     On March 4, 2016, JM accused Plaintiff of making an offensive remark to her.

97.     On March 14, 2016, JM removed Plaintiff from his normal job responsibilities and was placed in "prep".

98.     Prior to being placed in "prep", Plaintiff's was assigned to Deacon and was required to clean all the "dirty" trays that came in from the operating room after a surgery. However, Plaintiff's job responsibilities changes after being assigned to "Prep". Now his job responsibilities were to assemble sterile trays to place on carts that are brought into the operating room. In other words, Plaintiff was performing the opposite job duties.

99.     Thus, by being placed in "prep", Plaintiff lost the job duties he preferred and performed for many years.

100.    On or about April 1, 2016, Plaintiff was notified that effective April 16, 2016, his

employment as a Medical Supply Technician would terminate stating to Plaintiff that they no longer needed his services but went on to hire a replacement with no experience.

101.    On April 16, 2016, Plaintiff's employment with the VA was terminated.

102.    In the Final Agency Decision dated February 10, 2017, Maxanne R. Witkin, Director, Office of Employment Discrimination Complaint Adjudication, waived the 45-day statute of limitations period for all of Plaintiff's claims stating, "As all of [Plaintiff's] allegations have now been fully investigated, we will waive the 45-day time limit…"

## PRE-TRIAL PROCEEDINGS

103.    Mr. Hampton docketed a complaint recited the above in the Eastern District of New York.

104.    The matter survived a motion for summary judgment on the issue of retaliation and was the set for trial. The central issue being whether Mr. Hampton was a permanent employee or not. This issue was at the center of the causal connection with Mr. Hampton's claim of retaliation – because if he was permanent, defendant employee, would not have the "at will defense," they were giving.

105.    Defendants Joan Maggiore and Wilmino Sainbert  testified during depositions that Mr. Hampton was a permanent employee. Cite. [depo and page number ]. Exhibit 2 Joan Maggiore deposition  page 128 and Exhibit 3 Wilmino Sainbert  deposition  pages 35 lines 4-25, pages 36, 37, 38 and 39 lines 1- 7

106.    However, defendants then stated during trial he was not permanent. This was

perjury. Exhibit: 4 and 5  show the inconsistencies. ( Trial transcripts). Joan Maggiore trial transcript shows that pages 146 lines 23-25 and page 147 lines 1-5 contradict what she said in the depo about how she is the one that hires people. page 149 lines 4-8  in the depo she said she selects them and didn't have to interview Daniel.  Line 22 -24 It was a DEU certificate that Daniel was on. Page 154 lines 20-22 Joan believed Daniel was a permanent employee.  Wilmino Sainbert in the trial transcript page 268 lines 23-25 and page 269 lines 1-3  which is incorrect as Rita Burgess deposition shows she was not just someone in the nursing department but someone who worked with HR to fill vacancies in the nursing department.  As well as page 250 lines 23 -24 where he admits it is a DEU cert where in the depositions he was not sure and could not confirm.

107.    This was a conspiracy to change their testimony to undermine Mr. Hampton as a

group – to assert the wrong information under oath, at the behest of assistant U.S. attorney, Megan Freismuth, who knew that Mr. Hampton was a permanent employee.

108.    Moreover, employees who worked with Mr. Hampton, and never testified on his behalf due to the Freismuth Stipulation, still maintain that Mr. Hampton was a permanent employee. See affidavits submitted herein. Exhibits: 6-7. ( George and Rita affidavits).

109.    During depositions testimony of Joan Maggiore, Rita Burgess, Wilmino admitted Hampton was permanent. Exhibits: 2,8 and 3)

Wilmino during the deposition said you need to be on cert, but on trial he said you were cert. (contraction). Wilmino deposition page 39 lines 2 to 7 it's not a DEU cert. Wilmino trial transcript page 279 lines 13-25 page 280 and page 281 line 1.

Joan Maggiore during the deposition on page 128 lines 20-23 that she believed that Daniel was permanent. During trial she said it again contradicting what Wilmino said page 154 lines 20-22.

Rita Burgess deposition page 23 lines 10-25 about Joan selecting Daniel for a permanent position. Page 24 lines 18-25 and Page 25 line 1 and page 35 lines 2 to 19.

110.    Most pertinent, US assistant attorney, Megan Freismuth drafted a stipulation and entered it with Mr. Hampton's former trial attorneys. Exhibit:9. This stipulation was unconsented by Mr. Hampton who has now entered a separate settlement with his former attorneys to address their role in the issue. Such settlement did not address the role of the United States as represented by Ms. Freismuth, in her unofficial

duties (so far as the stipulation has been shown to be a fraud). Exhibit: 1.

111.    The progenitor of the stipulation and arguably the benefactor of a trial with witnesses withheld, assistant U.S attorney Freismuth and the United States refuse to undo any of the wrong the facilitated resulting in a trial with a false outcome and a case

determined on that false premise, *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021). This is a miscarriage of justice, which this court must address – if the stipulation was unconsented, the trial was a fraud upon the court and defendants in that case, the United States, and its assistant Us attorney cannot walk away under a Bivens theory of liability. An assistant U.s attorney's duties do not include abuse of power, see generally In re matter Bianca M Forde, exhibit:10 .

112.    This compliant also comes after the appeals court refused to address Mr. Hampton's underlying merits of the appeal and dismissed it based on procedure regarding Rule 4 (A).

113.    Defendants, individually and collectively, manufactured false evidence and testified falsely that Mr. Hampton was a temporary worker, knowing fully well that he was permanent. Exhibit 2: Joan says in her deposition page  that she selects the person off the cert to be hired  Page 121 lines 14-25 and page 122 lines 2-4 she says she hired him. This is in contradicts Exhibit 5 Wilmino Sainbert trial testimony where he says page 251 lines 20 to 25  page 252 where he says that we would need to receive the national official request to do a personal action. He is then contradicting what the Nursing Staffing coordinator Rita Burgess said Exhibit 8 in her deposition page 22-23 lines 1-3 and on page 34 lines 2-19 she states that the process was followed for Daniel to be permanent.  They were aided in

their plot by an overbroad and illegal stipulation. Exhibit: 8 (Email from Ms. Freismuth saying stipulation is not relevant).

114.    A stipulation is defined as a consented agreement between parties. Mr.

Hampton's stipulation was only consented by his representation and he government's representation, the primary accusation.

115.    Mr. Hampton alleges that Ms. Freismuth knew in fact that Mr. Hampton was a permanent employ, and that through use of the stipulation and selective advocacy

undermined this fact.

## TRIAL PROCEEIDNGS

( *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021)

116.    After two days of trial a verdict was entered in favor of defendants. Due to the stipulation entered between the plaintiff and defendant attorneys, Mr. Hampton did not call any witnesses besides himself. The witnesses he suggested to his attorneys and the evidence was excluded precisely due to the stipulation. See, Exhibit: 9.

### APPEAL PROCEEEDINGS
*Hampton v. Wilkie* (23-305) 2nd Circuit.

117.    Hampton appealed the lower court's proceedings. The Second Circuit refused to entertain the merits of the case, citing the holding that Rule 4 (A)

was a jurisdictional clause. Plaintiff appeals this decision to the full court, which denied the request for an *en banc* hearing, in a one sentence holding. Exhibit. 11. Plaintiff has ultimately filed a writ of certiorari, on this issue –however, the underlying constitutional concerns during the trial pause original claims as outlined in this complaint.

Ms. Freismuth argued that Mr. Hampton's remedy was with his lawyers.

Exhibit: 12 Appeal Transcript at page 7 at around the 18:00 mark after the court makes it statement ….. suggesting that she, as the progenitor and benefactor of the stipulation, is somehow above the remedial process for her wrongdoing.

118.    Throughout the appeal process Ms. Freismuth has refused to accept any responsibility for what happened or offer any remedial compromise to Mr. Hampton. See, in general Appellee's brief. Instead, she has argued that the 'stipulation,' evidentially rejected by Mr. Hampton as unconsented should stand and that the decision against Mr. Hampton should stand – how only redress is with his former attorneys (sic). This is *primae facie* proof that Ms. Friesmuth's intention

to benefit from a questionable decision is deliberate. *Mutual Life Insurance Co. of New York v. Hillmon*, 145 U.S. 285 ( 1892) and that her plan of action with the stipulation – be it consented or not – was to use it to her fullest advantage regardless of its authenticity.

Having received evidence that the stipulation was unconsented, pre-appeal and having the knowledge that his former attorneys have settled with him on the issue, would have put any reasonable attorney on notice that their "win" in the lower court is the fruit of fraud.

119.    Ms. Freismuth has offered no judicial remedy. She and her clients, the defendants in the underlying case were the ultimate benefactors of this fraud against Mr. Hampton through the "false stipulation", which has been shown to be unconsented. Despite knowledge of these facts, Ms. Freismuth has not moved to address this wrong, but instead sought to use technicalities to reap the benefits of a fraudulent trial – this goes beyond her duties as an assistant US attorney: which are duties only within the confines of ethical and legal guidelines of the practice of law, regarding presentment of evidence to a jury:

*Giglio v. United States*, 405 U.S. 150 (1972) and *Brady v. Maryland*, 373 U.S. 83 (1963).

120.    Stated differently, the duties of an assistant US attorney do not include the drafting and entering of stipulations in which the litigants show credible evidence they never consented to the stipulations with their representatives, even after the fact.

121.    Ms. Freismuth has not advocated for an evidential hearing or recommended alternative dispute resolution in this controversy; but sought to use technicalities in the appeal stage to maintain her ill-gotten gains. Consequently, this action has merits even under the most conservative reading of legal ethics.

122.    A fraud which cannot be constitutionally allowed to stand pursuant to the Fourteenth Amendment's Equal Protection clause, which while it offers Mr. Hampton no vehicle for his claims is offended on the basis of public morality or policy. A fraud against Mr. Hampton which is legally unacceptable under attorney's ethical obligations and evidential guidelines; is equally unacceptable before the courts.

## I.    FIRST CAUSE OF ACTION
### CIVIL CONSPIRACY
(By plaintiff Against ALL defendants)

123.    The plaintiff repeats, reiterates and realleges each allegation contained in paragraphs marked 1 through 122 with the same force and effect as if more fully set forth at length herein.

124.    The acts and conduct of the defendants constitute false testimony under oath, perjury during the trial - *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021. Defendants intended to confound proceedings with false testimony, misrepresenting when and how an employee becomes permanent.

125.    Plaintiff did not consent to the testimony.

126.    As a direct and proximate result of such acts, defendants deprived plaintiff of a fair trial under the laws of the State of New York and the United States Constitution.

127.    Defendants were always operating in the interest of defendant Wilkie in the underlying matter. The ultimate beneficiary was defendant Wilkie.

## I.    FIRST CAUSE OF ACTION
## (FEDEDERAL TORT CLIAM - FTCA)
## (NEGLIGENCE)

### (By plaintiff Against All Defendants)

128.    Plaintiff repeats all above paragraphs as if previously stated here.

129.    Asserts that defendants through their negligence engaged in actionable misconduct because their influenced the outcome of the trial.

130.    Defendants created the operative stipulation.

131.    Defendants induced Plaintiff's attorneys into a scheme against plaintiff.

132.     Defendants acted with a lack of care for their ethical and legal obligations.

133.     Defendants failed to inform the court of their ethical obligations and allowed the judgment to remain despite knowledge of the false stipulation.

## II.    SECOND CAUSE OF ACTION
## FOURTEENTH AMENDMENT
## FAIR PROCEEDINGS: EQUAL PROTECTION

(By plaintiff Against Defendants)

134.    Whereas the U.S Constitution states that: "nor deny to any person within its jurisdiction the equal protection of the laws."

135.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs marked 1 through 127 with the same force and effect as if more fully set forth at length herein.

136.    The acts and conduct of the defendants constitute false testimony under oath, perjury during the trial - *Hampton v. Wilkie*, 554 F. Supp. 3d 512 (E.D.N.Y. 2021. Defendants intended to confound proceedings with false testimony, misrepresenting when and how an employee becomes permanent.

137.    Plaintiff did not consent to the testimony.

138.    As a direct and proximate result of such acts, defendants deprived plaintiff of a fair trial under the laws of the State of New York and the United States Constitution.

139.    Defendants were always operating in the interest of defendant Wilkie in the underlying matter. The ultimate beneficiary was defendant Wilkie.

3572.1014-295831.1                                26

140.   Defendant Freismuth was the originator of the stipulation limiting testimony, witnesses and course of trial proceedings.

### III.   THIRD CAUSE OF ACTION
### EMOTIONAL PAIN AND SUFFERING

141.   Plaintiff restates and incorporates the above paragraphs as if fully stated here.

142.   To succeed in an emotional pain and suffering claim, the plaintiff must prove the defendants acted grossly unreasonably.

51. Plaintiff asserts that entering into a stipulation, knowing fully well that plaintiff did not participate was grossly unreasonable.

52. Seeking to strategically adjust the stipulation or ignore the omission of Hampton's then lawyers was grossly negligent.

53. As the drafter of the stipulation, not taking responsibility of its intended abuse.

54. Not arranging informing the court of the stipulation was grossly unreasonable.

55. Refusing to inform Judge Wick that the stipulation has issues, in violation of New York Bar Rule 3.3.

56. As a result of defendants actions, separate from underlying negligence plaintiff suffered emotional harm.

57. Defendants' actions outside of their ethical applications as defendants were unreasonable because of

the manner and deceptiveness of their actions, after the fact.

58. *These are separate facts upon which plaintiff has a cause of action, separate to the unconsented* stipulation.

## IV. FOURTH CAUSE OF ACTION
## FRAUD IN FACT
### (Against all defendants)

58. Plaintiff restates and incorporates the above paragraphs as if fully stated here.

59. To succeed in a common law fraud in fact, the plaintiff must prove the defendants acted grossly unreasonably.

60. Plaintiff asserts that entering a stipulation, knowing fully well that plaintiff did not consent, after the fact.

65. As a result of defendants actions, separate from the breach of trust, Hampton was unable to have a fair trial, in his advocacy given.

66. Defendants' actions outside of their ethical obligation are unreasonable because of the manner and deceptiveness of their lack of corrective steps.

67. These are separate facts upon which plaintiff has a cause of action, separate from negligence.

68. The underlying facts are a common law fraud intended to induce a court to maintain a decision, from a discredited stipulation.

69. Defendants benefited from the underlying false stipulation.

### JURY DEMAND

143.        Plaintiff demands a trial by jury on all the triable issues in this complaint.

### PRAYER FOR RELIEF

3572.1014-295831.1                          28

144.        WHEREFORE, Plaintiff prays for declaratory relief and damages as follows:

## RELIEF

145.   WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

146.   For damages in such amount as may be found, or as otherwise permitted by law.

147.   For plaintiff's attorney's fees, costs, and disbursement in this action pursuant to 42 U.S.C. 1988 and other relevant statutes; and

148.   For such other and further relief as the court may deem just and proper.

Dated:        Florida
              June 4th, 2026

                                                    By:


                                                    Daniel Hampton
                                                    Pro Se

                                                    631-299-9554

3572.1014-295831.1

# EXHIBIT LIST

| Exhibits |
|---|
| *1: writ of certiorari* |
| 2: Joan Maggiore deposition |
| 3:Wilmino Sainbert  deposition |
| 4: Joan Maggiore trial testimony |
| 5: Wilmino Sainbert trial testimony |
| 6: Rita Burgess  affidavit |
| 7: George  Asare Affidavit |
| 8. Rita Burgess  Deposition |
| 9: Email from Ms. Freismuth saying stipulation is not relevant |
| 10: Stipulation |
| 11:Bianca M Forde |
| 12: En Banc |
| 13: Appeal Transcript |